UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LUZ ESPADA,

                    Plaintiff,                                MEMORANDUM AND ORDER
                                                    18-CV-5443 (ILG) (JO)

    *v.*

GUARDIAN SERVICE INDUSTRIES, INC.,
and ANGEL QUILES,

                    Defendants.
------------------------------------------------------------x
GLASSER, Senior United States District Judge:

        Plaintiff Luz Espada brought this action against Defendants Guardian Service Industries,

Inc. (**"Guardian"**) and Angel Quiles (**"Quiles"**) pursuant to Title VII of the Civil Rights Act of

1964 (**"Title VII"**), the New York State Human Rights Law, N.Y. Exec. L. § 296

(**"NYSHRL"**), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a)

(**"NYCHRL"**), alleging sex discrimination and retaliation. (*See* Compl., ECF No. 1). Pending

before the Court are two motions. First, Defendants move to compel arbitration and stay or, in

the alternative, set aside the proceedings. (*See* ECF Nos. 7, 29). Second, Quiles has submitted a

*pro se* letter dated February 22, 2019, which the Court construes liberally as a motion to dismiss

the proceedings under Federal Rule of Civil Procedure 12(b)(5). (*See* ECF No. 20).[1]

---

[1] Quiles also states that he cannot afford counsel and requests that the Court appoint him a "free
lawyer." (ECF No. 20). The Court cannot grant such a request in this civil case. However, the
Federal Pro Se Legal Assistance Project of the City Bar Justice Center provides free information,
advice, and limited-scope legal assistance to non-incarcerated, *pro se* litigants in the Eastern
District of New York. The Court refers Quiles to their website for more information:
https://www.citybarjusticecenter.org/projects/federal-pro-se-legal-assistance-project/.

# BACKGROUND

The following background information is common to both sets of motions. Additional background information, where relevant, is set forth in the sections that follow.

Guardian describes itself as a "full-service janitorial and building maintenance company" that "provides janitorial cleaning, building maintenance, and related services to commercial sites and buildings in and around the New York metropolitan region." (Def. Mem. at 1, 3, ECF No. 7-1, at 5, 7). Plaintiff worked for Guardian as a porter at an apartment complex in Staten Island. (*See* Compl. ¶¶ 18-19). At all relevant times, she was a member of the Service Employees International Union, Local 32BJ (**"SEIU Local 32BJ"** or the **"Union"**). (*See* Pl. Opp. at 1, ECF No. 14 at 6; Pl. Exs. C, D, ECF Nos. 13-4, 13-5).

Plaintiff alleges that Quiles, her manager, persistently subjected her to sexual harassment, both verbal and physical, between October 2016 and May 2017. (*See* Compl. ¶¶ 11, 27-41).[2] In one incident, Quiles allegedly instructed Plaintiff to follow him into a vacant apartment where he told her to "get on all fours" and clean the floor. (*Id.* ¶¶ 70-74). As Plaintiff was getting ready to walk out of the apartment, Quiles allegedly "smacked" her buttocks and made a crude sexual remark. (*Id.* ¶ 76). This prompted Plaintiff to call 911 and report Quiles to the police. (*See id.* ¶¶ 77, 79, 84; Police Report, Pl. Ex. F, ECF No. 13-7). Quiles was allegedly removed as superintendent, but remained a Guardian employee and was permitted to continue living inside the apartment complex. (*See* Compl. ¶¶ 8-9, 83). After complaining about Quiles and filing a police report against him, Plaintiff was allegedly given numerous disciplinary sanctions that

---

[2] In his February 22, 2019 letter, Quiles disputes that he was Plaintiff's manager, stating that he "was a worker and nothing more." (ECF No. 20, at 1).

were more severe than those given to similarly situated employees, culminating in her constructive termination from Guardian. (*See id.* ¶¶ 51-69, 85-95).

Plaintiff filed a grievance with the Union, alleging sexual harassment. (*See* Pl. Ex. A, at 8, ECF No. 13-1; Pl. Ex. C). On November 3, 2017, the Union notified Plaintiff that they would not bring a discrimination claim on her behalf due to her lack of "cooperation" in the investigation. (Pl. Ex. C). On November 10, 2017, Plaintiff notified Guardian that she would pursue her claims individually. (*See* Pl. Ex. D). The parties attempted without success to mediate the dispute on February 22, 2018. (*See* Akin Decl. ¶ 13, ECF No. 13; Pl. Ex. D). Thereafter, on March 27, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued a right to sue letter on July 18, 2018. (*See* Pl. Ex. A; Pl. Ex. E, ECF No. 13-6).[3] Plaintiff commenced this lawsuit by filing a complaint on September 27, 2018. (ECF No. 1).

## DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY OR, ALTERNATIVELY, DISMISS PROCEEDINGS

On December 21, 2018, Guardian moved to compel arbitration and stay or, alternatively, dismiss the proceedings. (*See* ECF No. 7). On March 12, 2019, Quiles, appearing *pro se*, moved for the same relief and joined Guardian's motion. (*See* ECF No. 29).[4] Defendants argue that

---

[3] "Generally, a right-to-sue letter is required when a private employee files a Title VII suit in district court." *DiPetto v. U.S. Postal Service*, 383 Fed. Appx. 102, 104 (2d Cir. 2010) (summary order). The issuance of a right-to-sue letter does not imply a favorable view by the EEOC of the merits of a claim. *See Stephenson v. Smith*, No. 11-CV-152 (RAJ), 2012 WL 7959235, at *1 n. 1 (E.D.N.Y. Mar. 2, 2012) ("The EEOC issues right to sue letters once its procedures are concluded, regardless of the merits of the claim").

[4] Because the Clerk of Court previously entered a Certificate of Default against Quiles (*see* ECF No. 12), Quiles' motion to compel arbitration is a nullity unless grounds exist to set aside the default under Federal Rule of Civil Procedure 55(c). As discussed below in relation to Quiles' February 22, 2019 *pro se* motion, Quiles may not have been validly served in accordance with

Plaintiff's claims are subject to mandatory arbitration under the terms of a collective bargaining agreement (Pl. Ex. B, ECF Nos. 13-2, 13-3) (the **"CBA"**) between the Union and the Realty Advisory Board on Labor Relations, Inc. (**"RAB"**), a multi-employer bargaining unit that includes Guardian (*see* Def. Mem. at 1).[5]

Article V ("Grievance Procedure") and Article VI ("Arbitration") outline the CBA's grievance and arbitration machinery. (*See* CBA Arts. V, VI, at 13-20). Under these Articles, a "grievance may first be taken up between a representative of management and a representative of the Union," and, "[i]f it is not settled, it may be filed for arbitration." (*Id.* Art. V, § 3, at 14). Article XIX § 23(A) of the CBA prohibits discrimination in violation of, *inter alia*, Title VII, the NYSHRL, and the NYCHRL, and provides that "[a]ll such claims shall be subject to the grievance and arbitration procedure" outlined in Articles V and VI. (*Id.* Art. XIX, § 23(A), at 106-107).[6] Defendants argue that Plaintiff's claims "are plainly covered" by this provision. (Def.

---

Federal Rule of Civil Procedure 4, which would be grounds to vacate the default. However, even if his default were set aside, the motion to compel arbitration would be denied for the reasons set forth herein.

[5] Defendants also assert, in passing, a separate ground for dismissing this action: that Plaintiff did not "exhaust[] her administrative remedies." (Def. Mem. at 9). On close inspection, this is simply a repackaging of their main argument that Plaintiff "ignored the mandatory … arbitration procedures provided in the [] CBA." (*Id.*).

[6] The relevant provision states:

> There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, sexual orientation, union membership, or any characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, 42 U.S.C. Section 1981, Family and Medical Leave Act, the New York State Human Rights Law, the New York City Human Rights Code, or any other similar laws, rules or regulations. ***All such claims shall be subject to the grievance and arbitration procedure (Articles V and VI)***

Mem. at 2). However, the CBA provides that only the Union may bring a grievance on behalf of an employee under Article V or demand that the grievance be arbitrated under Article VI. (*See* CBA Art. V, § 4, at 14; Art. VI, § 2, at 16).[7] Plaintiff therefore contends that the CBA only requires arbitration of claims brought by the Union. (*See* Pl. Opp. at 11-14). Where the Union declines to bring a grievance on an employee's behalf, as it has done here, Plaintiff argues that the CBA is no obstacle to the employee bringing her claim in court. (*See id.*).

This CBA is one of several that have been entered into between SEIU Local 32BJ and the Union; all contain similarly-worded arbitration provisions. There has been much litigation over the years as to how the seemingly broad scope of the CBA's mandatory arbitration clause should be reconciled with the fact that the CBA grants the Union the sole right to demand arbitration of discrimination claims. In 2009, one such case reached the Supreme Court. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009). In *Penn Plaza*, the plaintiffs, all of whom were members of SEIU Local 32BJ, brought Age Discrimination in Employment Act (ADEA) claims in federal court after the Union declined to pursue their age discrimination grievances under the CBA. *See id.* at 251-253. The defendants, also members of RAB, moved to compel arbitration. *See id.* at 251, 254.

---

*as* [*sic*] *sole and exclusive remedy for violations*. (CBA Art. XIX, § 23(A), at 106-107) (emphasis added).

[7] Specifically, Article V § 4 states, in connection with the CBA's grievance procedure, that "[a]ll Union claims are brought by the Union alone and no individual shall have the right to compromise or settle any claim without the written permission of the Union." As used in this clause, the phrase "Union claims" is most logically understood to mean claims asserted on behalf of a Union member, as opposed to claims asserted on behalf of management. Because a claim may not be arbitrated under Article VI unless it is first brought as a grievance under Article V (*see id.* Art. V, § 3, at 14), this clause effectively vests the Union with the exclusive right to demand arbitration of an employee's claims. Furthermore, Article VI states that an arbitration may be commenced by "the Union or the RAB"; it says nothing about commencement of arbitration by an individual grievant. (*Id.* Art. VI, § 2, at 16).

In opposition to the motion, the plaintiffs, joined by the Union as *amicus curiae*, argued that the CBA provided no mechanism for individual employees to demand arbitration if the Union declines to arbitrate a claim on their behalf. *See* Br. for Respondents in *Penn Plaza*, No. 07-581, 2008 WL 2774462, at *44-*46 (July 14, 2008); Br. of the Service Employees International Union, Local 32BJ, as Amicus Curiae in Support of Respondents in *Penn Plaza*, No. 07-581, 2008 WL 2724312 (July 10, 2008). Among other things, the plaintiffs and the Union emphasized that the CBA, by its clear and unambiguous terms, required "[a]ll Union claims" to be "brought by the Union alone." Br. for Respondents, at *44; Br. of SEIU Local 32BJ, at *14. "Given the Union's control over employee discrimination claims," they argued, "the Plaintiffs had no contractual right or ability 'to arbitrate [their ADEA] claims ....'" Br. of SEIU Local 32BJ, at *18 (alterations in the original); *see* Br. for Respondents, at *45 ("[I]ndividual employees have no power to invoke this CBA's arbitration provision without Local 32BJ's consent and Local 32BJ's control over the litigation. When, as here, Local 32BJ refuses to take respondents' claims to CBA arbitration, there is no arbitration to compel").

A related yet conceptually distinct argument was advanced by the United States Solicitor General, appearing as *amicus curiae*, and also adopted by the plaintiffs. The plaintiffs and the Solicitor General argued that to interpret the CBA as foreclosing litigation once the Union had refused to arbitrate an employee's claim would be to deprive the plaintiffs of *any* forum—judicial or arbitral—in which to "vindicat[e]" their rights. Br. for Respondents, at *30; *see* Br. for the United States as Amicus Curiae Supporting Respondents in *Penn Plaza*, No. 07-581, 2008 WL 2817676, at *18-*19 (July 21, 2008). That result, they argued, would be unenforceable on the principle that "substantive guarantees of federal anti-discrimination law are not waivable," Br. for United States, at *19, and that a compulsory arbitration clause embracing statutory causes

of action must permit the prospective litigant to "effectively … vindicat[e]" those rights in the arbitral forum, Br. for Respondents, at *30 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985)); *accord* Br. for United States, at *19.

In its decision, the Supreme Court agreed that "a substantive waiver of federally protected civil rights will not be upheld." *Penn Plaza*, 556 U.S. at 273. However, it declined to explore whether the CBA actually prohibited the plaintiffs from demanding arbitration in their individual capacities, as the plaintiffs and SEIU Local 32BJ argued. *See id.* at 272-273. Likewise, it did not reach the merits of plaintiffs' and the Solicitor General's argument that "the CBA operates as a substantive waiver of their ADEA rights because it … allows the Union to block arbitration of these claims." *Id.* at 273-274; *see also id.* at 285 (Souter, J., dissenting) (noting that the Court "explicitly reserves the question whether a CBA's waiver of a judicial forum is enforceable when the union controls access to and presentation of employees' claims in arbitration"). As to both of these arguments, the Court found that the matter was insufficiently preserved and beyond the scope of the question presented for review. *See id.* at 272-274.[8]

The questions reserved in *Penn Plaza* were directly addressed in a later case, *Kravar v. Triangle Services, Inc.*, No. 06-CV-7858 (RJH), 2009 WL 1392595 (S.D.N.Y. May 19, 2009). The facts in *Kravar* were in all relevant respects identical to those present in *Penn Plaza* (and

---

[8] The issue upon which the Supreme Court actually granted review in *Penn Plaza* was a narrow question of law: "whether a provision in a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate claims arising under the [ADEA] is enforceable," *Penn Plaza*, 556 U.S. at 251, a question it easily answered it in the affirmative, *see id.* at 274. What the Court did not address was whether the ***particular CBA before it*** "clearly and unmistakably" required arbitration of the plaintiffs' claims. As the Court explained, the "lower courts assumed that the CBA's arbitration clause clearly applied to" plaintiffs' claims, and the Supreme Court "granted review of the question presented on that understanding." *Id.* at 272-273.

this case). The plaintiff, Eva Kravar, brought discrimination claims against her employer under Title VII, the Americans with Disabilities Act (ADA), and the NYCHRL. *See* 509 F.Supp.2d 407, 408 (S.D.N.Y. 2007). Prior to filing suit, the plaintiff sought to arbitrate her claims under the CBA, but "the union declined to prosecute her claims[.]" 2009 WL 1392595, at *3. The CBA in *Kravar*, like the one in *Penn Plaza*, precluded the plaintiff from demanding arbitration of her claim on an individual basis. *See id.* at *2. Therefore, the court denied the defendant's motion to compel arbitration, holding that the record "support[ed] a single conclusion: The CBA here operated to preclude Ms. Kravar from raising her disability-discrimination claims in *any* forum. As such, the CBA operated as a waiver over Ms. Kravar's substantive rights, and may not be enforced." *Id.* at *3 (emphasis in original). In essence, the *Kravar* court endorsed the argument that the Supreme Court left unaddressed in *Penn Plaza*: that "the CBA operates as a substantive waiver of [the plaintiffs' statutory] rights [to the extent that it] allows the Union to block arbitration of those claims." *Penn Plaza*, 556 U.S. at 273.

Several cases addressing materially identical CBAs have concurred in *Kravar*'s analysis and held an employee may litigate a statutory discrimination claim where the Union has declined to submit it to arbitration under the CBA, lest the CBA operate as a waiver of the employee's federally-protected civil rights. *See Borrero v. Ruppert Housing Co., Inc.*, No. 08-CV-5869 (HB), 2009 WL 1748060, at *2 (S.D.N.Y. Jun. 19, 2009) ("Should Borrero's attempts to arbitrate his claims be thwarted by the Union, the CBA will have operated as a 'substantive waiver' of his statutorily created rights and he will have the right to re-file his claims in federal court"); *Morris v. Temco Service Industries, Inc.*, No. 09-CV-6194 (WHP), 2010 WL 3291810, at *5-*6 (S.D.N.Y. Aug. 12, 2010) (addressing facts similar to *Kravar* and adopting its reasoning); *Canales v. ACP Facility Services, Inc.*, No. 17-CV-6937 (DRH) (AYS), 2019 WL

1171479, at *5 (E.D.N.Y. Mar. 13, 2019) (following *Kravar* and *Morris* and denying motion to compel arbitration, but dismissing plaintiff's claims on the grounds that she did not "giv[e] the Union an opportunity to pursue" her claim in the first place). More generally, courts have held that, "where the submission of a statutory claim to arbitration is exclusively within the province of the union and the union declines to pursue the matter, the waiver of an employee's right to a judicial forum is unenforceable." *de Souza Silva v. Pioneer Janitorial Services, Inc.*, 777 F.Supp.2d 198, 206 (D. Mass. 2011); *see Alfonso v. Maggies Paratransit Corp.*, 203 F.Supp.3d 244, 250-251 (E.D.N.Y. 2016); *Drake v. Hyundai Rotem USA, Corp.*, No. 13-CV-868 (RLB), 2013 WL 4551228, at *5-*6 (E.D. Pa. Aug. 28, 2013); *Brown v. Services for the Underserved*, No. 12-CV-317 (JG), 2012 WL 3111903 (E.D.N.Y. Jul. 31, 2012).[9]

This case presents an added layer of complexity, however. On February 17, 2010, after *Penn Plaza* and *Kravar* were decided, the Union and RAB amended the CBA by adding a new provision, referred to as the No-Discrimination Protocol (CBA Art. XIX, § 23(B), at 107-115) (the **"No-Discrimination Protocol"** or the **"Protocol"**). Among other things, the Protocol creates a vehicle for individual employees to arbitrate their discrimination claims if the Union declines to represent them. (*See id.* § 23(B)(3), at 113-115). The Protocol's arbitration clause is permissive, not mandatory: it does not explicitly require an employee to utilize its procedures if

_____

[9] Notably, while the Supreme Court has only said that a "substantive waiver of [a] *federally* protected civil right[] will not be upheld," *Penn Plaza*, 556 U.S. at 273 (emphasis added), *Kravar* and its progeny have made no distinction between federal and state anti-discrimination statutes. *See Kravar*, *supra* (denying motion to compel arbitration of claims under Title VII, ADA, and NYCHRL); *Morris*, *supra* (following *Kravar* and denying motion to compel arbitration of claims under Title VII, NYSHRL, and NYCHRL); *Canales*, 2019 WL 1171479, at *5 (following *Kravar* and *Morris* and denying motion to compel arbitration of claims brought solely under the NYSHRL).

the employee does not wish to do so.[10] Nevertheless, by providing an avenue for an employee to

demand arbitration in their individual capacities, it could be argued that the Protocol cures the

---

[10] Defendants dispute this, claiming that the Protocol's arbitration provision is in fact mandatory. (*See* Def. Mem. at 7; Def. Reply at 3, 6, ECF No. 18, at 5, 8). But this is a misreading of the provision in question, which states as follows:

> (3)    Arbitration
>
> (a)    The undertakings described here with respect to arbitration apply to those circumstances in which the Union has declined to take an individual employee's employment discrimination claim under the no discrimination clause of the CBA (including statutory claims) to arbitration and the employee is desirous of litigating the claim. The forum described here will be available to employers and employees who are represented by counsel and to those who are unrepresented by counsel.
>
> (b) The Union and the RAB have elicited from the American Arbitration Association ("AAA") a list of arbitrators who (1) are attorneys, and (2) are qualified to decide employment discrimination cases. In the event that an employee and RAB member employer seek arbitration of a discrimination claim in the circumstances described in paragraph A, the list of arbitrators provided by the AAA shall be made available to the individual employee and the RAB member employer by the administrator of OCA. The manner by which selection is made by the RAB member employer and the individual employee and the extent to which each shall bear responsibility for the costs of the arbitrator shall be decided between them. A person may be added to or removed from the Statutory Arbitration Panel list upon mutual agreement of the Union and the RAB. Any such arbitrations shall be conducted pursuant to the AAA National Rules for Employment Disputes, except those rules pertaining to administration by the AAA and the payment of fees, and any disputes about the manner of proceeding shall be decided by the arbitrator selected.

(CBA Art. XIX, § 23(B)(3)(a)-(b), at 113-114).

Nothing in these clauses compels an individual employee to submit to arbitration. Instead, this subsection merely makes "available to the individual employee" the resources described in subparagraph (b)—including AAA arbitrators—whenever "an employee and RAB member employer seek arbitration of a discrimination claim." In the absence of any mandatory language, this arbitration provision must be construed as permissive.

defect in the CBA identified in *Kravar* and its progeny. This argument, however, would be mistaken.

Critical to understanding the Protocol is the following language, which is contained in the preface to the Protocol itself:

> As background, following the decision of the Supreme Court in 14 Penn Plaza, 556 U.S. 247 (2009), the RAB and the Union have had a dispute about the meaning of the "no discrimination clause" and the grievance and arbitration clauses in the collective bargaining agreements ("CBAs") entered into between these parties. The Union contends that the CBAs do not make provision for arbitration of any claims that the Union does not choose to take to arbitration, including statutory discrimination claims, and therefore, individual employees are not barred from pursuing their discrimination claims in court where the Union has declined to pursue them in arbitration. The RAB contends that the CBAs provide for arbitration of all individual claims, even where the Union has declined to bring such claims to arbitration.
>
> …
>
> Notwithstanding the above disagreement, in 2010, the parties initiated the pilot program provided for in this section (Agreement and Protocol, February 17, 2010, the "No Discrimination Protocol") as an alternative to arbitrating their disagreement. The parties have now agreed to include the No-Discrimination Protocol as part of this Agreement, as set forth below. ***The Union and the RAB agree that the provisions of this Protocol do not resolve the reserved question. Neither the inclusion of this Protocol in the CBAs nor the terms of the Protocol shall be understood to advance either party's contention as to the meaning of the CBAs with regard to the reserved question,*** and neither party will make any representation to the contrary.

(CBA Art. XIX, § 23(B)(1), at 108-110) (emphasis added). As the emphasized language above makes it clear, neither the "inclusion" of the Protocol, "nor [its] terms," "shall be understood to advance either party's contention" with respect to the so-called "reserved question"—that is, the question of whether claims brought by individual employees are subject to compulsory arbitration. (*Id.* at 110). Thus, although default rules of contractual interpretation would require the Court to examine the CBA "as a whole," *Bozetarnik v. Mahland*, 195 F.3d 77, 82 (2d Cir.

1999); *see also Global Reinsurance Corp. of America v. Century Indemnity Co.*, 30 N.Y.3d 508, 517 (2017), the Protocol demands that we put on blinders, resolving the issue as if it simply did not exist.

When we remove the Protocol from our analysis, this case becomes virtually indistinguishable from *Kravar*. Here, as in *Kravar*, the CBA, **excised of the Protocol**, grants the Union the sole right to bring an employee grievance or demand that it be arbitrated. In the absence of language permitting an individual employee to demand arbitration herself, where the Union has refused to bring a grievance, there is simply "no arbitration to compel." Br. for Respondents in *Penn Plaza*, at *45. Thus, as in *Kravar* and kindred cases, the CBA must be construed as preserving an employee's right to litigate their statutory discrimination claims where the Union has declined to arbitrate the claim under the CBA. *See Kravar*, 2009 WL 1392595, at *3; *Morris*, 2010 WL 3291810, at *5-*6; *Canales*, 2019 WL 1171479, at *5. A contrary interpretation would entrust the protection of an employee's statutory rights under Title VII entirely to the whims of the Union. And, as the Supreme Court recently warned, "when a union controls the grievance process, it may, as a practical matter, effectively subordinate 'the interests of an individual employee … to the collective interests of all employees in the bargaining unit.' " *Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448, 2468 (2018) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 58 n. 19 (1974)). Furthermore, if the Union declines to arbitrate a claim of discrimination under Title VII, the CBA's mandatory arbitration provision, if construed expansively to cover individual employee claims, would deprive those employees from vindicating their statutory rights in *any* forum. Ample precedent makes clear that this is an unacceptable result. *See Penn Plaza*, 556 U.S. at 273 ("[A] substantive waiver of federally protected civil rights will not be upheld");

*American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235-236 (2013) (collecting

cases); *In re American Exp. Merchants' Litigation*, 681 F.3d 139, 140-141 (2d Cir. 2012) (same).

As the Second Circuit has stated:

> [A] federal court will compel arbitration of a statutory claim only if it is
> clear that "the prospective litigant effectively may vindicate its statutory
> cause of action in the arbitral forum," such that the statute under which its
> claims are brought "will continue to serve both its remedial and deterrent
> function." *Mitsubishi*, 473 U.S. at 637 [] . Thus, as the Supreme Court stated
> in *Mitsubishi*, if certain terms of an arbitration agreement served to act "as
> a prospective waiver of a party's right to pursue statutory remedies … , we
> would have little hesitation in condemning the agreement as against public
> policy." *Id.* at 637 n. 19 [] .

*Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 125 (2d Cir. 2010).

To be sure, this is a counterintuitive outcome. The lynchpin of *Kravar*'s analysis is that

the CBA between the Union and RAB makes no provision for employees to arbitrate their

discrimination claims. But the No-Discrimination Protocol, adopted after *Kravar* was decided,

explicitly includes an option for employees to arbitrate their claims. The answer to this riddle lies

in the Protocol's statement that neither its "inclusion" nor its "terms" shall "advance either

party's contention" as to whether individual employee claims must be arbitrated. (CBA Art.

XIX, §23(B)(1), at 110). After all, the Protocol was not intended to "resolve the reserved

question." (*Id.*). Instead, it is more sensibly understood as having frozen in place the parties' pre-

existing disagreement as to the meaning of the pre-Protocol CBA, leaving it for future courts to

decide, while offering a voluntary arbitration mechanism in those cases where arbitration was

desired.

Resisting this conclusion, Defendants cite a handful of district court cases that have

compelled arbitration under a substantially identical CBA. *See Lobban v. Cromwell Towers*

*Apartments, Limited Partnership*, 345 F.Supp.3d 334 (S.D.N.Y. 2018); *Favors v. Triangle*

*Servs.*, 207 F.Supp.3d 197, 204 (E.D.N.Y. 2016); *Sajdlowska v. Guardian Service Industries, Inc.*, No. 16-CV-3947 (PAE), 2016 WL 7015755 (S.D.N.Y. Dec. 1, 2016); *Begonja v. Vornado Realty Trust*, 159 F.Supp.3d 402 (S.D.N.Y. 2016); *Okuma v. Crotona Park West Hous. Dev. Fund Corp.*, No. 14-CV-239 (DAB), Dkt No. 19 (S.D.N.Y. Sept. 29, 2014); *Germosen v. ABM Industries Corp.*, No. 13-CV-1978 (ER), 2014 WL 4211347 (S.D.N.Y. Aug. 24, 2014); *Bouras v. Good Hope Management Corp.*, No. 11-CV-8708 (WHP), 2012 WL 3055864, at *4 (S.D.N.Y. Jul. 24, 2012); *Duraku v. Tishman Speyer Properties, Inc.*, 714 F.Supp.2d 470, 474 (S.D.N.Y. 2010); *Garcia v. Frank*, No. 09-CV-4599 (BSJ), Dkt No. 17 (S.D.N.Y. Jul. 28, 2010).

Some of these cases are entirely distinguishable. In *Favors* and *Begonja*, the plaintiffs made no showing that the Union had actually declined to arbitrate Plaintiff's claims. *See Favors* 207 F.Supp.3d at 203; *Begonja*, 159 F.Supp.3d at 411. And in *Sajdlowska*, the plaintiff in that case conceded that "her discrimination claims [fell] within the scope of the CBA's mandatory arbitration clause." 2016 WL 7015755, at *4.

To the extent that these cases are not distinguishable, they are unpersuasive. In *Lobban*, the court compelled arbitration after reading the Protocol's arbitration provision as mandatory rather than permissive. *See* 345 F.Supp.3d at 348-349. *Duraku* interpreted the Protocol the same way, *see* 714 F.Supp.2d at 474, and *Garcia* followed *Duraku*, *see* No. 09-CV-4599, Dkt No. 17, at 9. But, as previously noted, the Court does not read the Protocol's arbitration provision to be compulsory. *See supra* note 10; *see also Germosen*, 2014 WL 4211347, at *3 (reading the Protocol's arbitration clause as "permit[ting] the individual employee to arbitrate the claim on his own").

In *Okuma*, the court enforced the arbitration provision based on its understanding that an identical provision was enforced in *Penn Plaza*. *See Okuma*, No. 14-CV-239, Dkt No. 19, at 13-

14. However, the argument that the CBA was an impermissible "substantive waiver" was not explored on the merits in *Penn Plaza*, as the dissent in that case was careful to note. *See Penn Plaza*, 556 U.S. at 285 (Souter, J., dissenting); *see also Begonja*, 159 F.Supp.3d at 409-410 ("[T]he Supreme Court in [*Penn Plaza*] declined to reach respondents' separate argument that the agreement at issue there operated as a substantive waiver of their statutory rights because the Union was able to block arbitration of ADEA claims"). *Okuma* is therefore not a persuasive counterpoint to *Kravar* and similar cases, which rely on this "substantive waiver" argument.

In *Bouras*, the court compelled arbitration in part by reasoning that, due to the addition of the Protocol, the CBA no longer prohibits employees from bringing discrimination claims on an individual basis (as it did when *Kravar* and *Morris* were decided). *See* 2012 WL 3055864, at *4. *Germosen* relies on the same reasoning. *See* 2014 WL 4211347, at *7 n. 19. But neither of these cases discussed the important proviso that neither the Protocol's "inclusion" nor its "terms" should be understood to alter the meaning of the CBA with respect to whether arbitration of individual employee claims is compulsory. (CBA Art. XIX, § 23(B)(1), at 110). As the Court has previously mentioned, the CBA must be analyzed in the absence of the Protocol in order to give effect to these words.

Finally, in its reply brief, Guardian raises a novel argument: that the question of whether Plaintiff's claims are subject to mandatory arbitration is *itself* arbitrable under the Protocol. (*See* Def. Reply at 3; CBA Art. XIX, § 23(A)(1), at 109). An arbitration agreement may, of course, delegate threshold questions of arbitrability to an arbitrator. *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 527 (2019). Here, the Protocol contains a delegation clause stating, in relevant part, that:

> [S]hould either the Union or the RAB deem it appropriate or necessary to do so, that party may bring to arbitration the question so reserved. The

> parties intend that the reserved question may only be resolved in an arbitration between them and not in any form of judicial proceeding.

(CBA Art. XIX, § 23(A)(1), at 109). But Guardian waived enforcement of the CBA's delegation clause when it asked the Court, in its opening papers, to rule directly on the "reserved question" by holding that Plaintiff's underlying claims are arbitrable. *See Fisher v. Kanas*, 487 F.Supp.2d 270, 278 (E.D.N.Y. 2007) (arguments raised for the first time in a reply brief may be deemed waived). In any event, the delegation clause by its terms may be invoked solely by "the Union or the RAB," and it only contemplates an arbitration proceeding "*between them*"—that is, between the Union and RAB. (CBA Art. XIX, § 23(A)(1), at 109). Defendants obviously cannot compel the Union and RAB, neither of whom is a party to this litigation, to commence arbitration proceedings. The Court is therefore unpersuaded by Defendants' delegation clause argument.

For the foregoing reasons, Defendants' motion to compel arbitration and stay or dismiss the proceedings is denied.

## QUILES' *PRO SE* MOTION

On January 4, 2019, the Honorable James Orenstein found that Plaintiff "ha[d] not filed proof of timely service of the summons and complaint" on Quiles and directed Plaintiff to file proof of service on Quiles within one week. (1/4/2019 Electronic Order). Later that same day, Plaintiff filed an Affidavit of Service stating that a copy of the summons and complaint was served upon the "Concierge" at Quiles' apartment building on October 12, 2018 and mailed to his apartment address on October 15, 2018. (ECF No. 9). The Affidavit of Service does not say whether the process server sought access to Quiles' actual apartment. On January 9, 2019, after the Affidavit of Service was filed, Judge Orenstein directed Plaintiff to file a request for a Certificate of Default within two weeks unless Quiles filed an answer or the parties filed a stipulation extending his time to answer. (*See id.*). Plaintiff filed a request for a Certificate of

Default on January 14, 2019 (ECF No. 10), and the Clerk of Court filed a Certificate of Default on January 17, 2019 (ECF No. 12).

Following entry of default, the Court received a *pro se* letter from Quiles, dated February 22, 2019, in which he states that he "was not served with any papers in this case" and did not learn of the case until "late last month," *i.e.*, January 2019. (ECF No. 20, at 1). He alleges that "[t]he copy of the service certificate is false because I reviewed the video tapes, and no one served papers to me, as the service certificate claims." (*Id.*).

A "party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation." *In re Sims*, 534 F.3d 117, 133 (2d Cir. 2008) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)). "[C]ourts are … to construe a *pro se* litigant's pleadings and motions liberally." *Id.* (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Here, Quiles' February 22, 2019 correspondence may be liberally construed as a motion to dismiss under Rule 12(b)(5) of the Federal Rules of Civil Procedure for insufficient service of process. *See Bruccoleri v. Gangemi*, No. 18-CV-7443 (ILG), 2019 WL 499769, at *3 n. 2 (E.D.N.Y. Feb. 8, 2019) ("[T]he proper vehicle to dismiss an action for insufficient service of process is Rule 12(b)(5)….")

In order for personal jurisdiction over Quiles to exist, he must have been properly served with a copy of the summons and complaint in accordance with Rule 4 of the Federal Rules of Civil Procedure. *See Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied"); *American Telephone & Telepgraph Co. v. Merry*, 592 F.2d 118, 126 (2d Cir. 1979). The fact that a defendant has defaulted under Rule 55 does not relieve the court of the obligation to ensure that personal

jurisdiction exists. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 n. 22 (2d Cir. 2011) (where a "defendant fail[s] to answer the complaint but later contest[s] the entry of default judgment against it, … the district court [is] bound to inquire into personal jurisdiction before entering judgment") (citing *Credit Lyonnais Securities (USA), Inc. v. Alcanatar*, 183 F.3d 151 (2d Cir. 1999)); *Golden Ring International, Inc. v. Cullen*, No. 18-CV-1244 (DNH), 2019 WL 4015638, at *6 (N.D.N.Y. Aug. 26, 2019) ("On [defaulting] defendants' motion, … it becomes the court's duty to consider whether it has personal jurisdiction over the defendants"). In considering a motion to dismiss pursuant to Rule 12(b)(5), "[t]he plaintiff bears the burden of proving those facts that rendered service of process adequate." *Bruccoleri*, 2019 WL 499769, at *3.

Rule 4(e) provides, in relevant part, that an individual may be served by:

(1)    following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2)    doing any of the following:

(A)    delivering a copy of the summons and of the complaint to the individual personally;

(B)    leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C)    delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e).

Paragraph (2) is inapplicable to the facts of this case. Subparagraph (2)(B) provides that an individual may be served by leaving the document "at the individual's dwelling or usual place of abode with someone of suitable age and discretion *who resides there*[.]" Fed. R. Civ. P.

4(e)(2)(B) (emphasis added). Here, however, the Affidavit of Service states that the summons and complaint was delivered to the building's "[c]oncierge," not to a resident. (ECF No. 9). Subparagraphs (2)(A) and (C) are likewise inapplicable, as service was neither effected upon Quiles personally, nor upon his authorized agent.

Therefore, if service is to be deemed adequate, it must be permissible under New York's rules for service of process. *See* Fed. R. Civ. P. 4(e)(1). The only potentially applicable provision is Section 308(2) of the New York Civil Practice Law and Rules (**"CPLR"**), which provides, in relevant part, that an individual may be served:

> by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode to the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business.

CPLR § 308(2). Unlike Rule 4(e)(2)(B) of the Federal Rules of Civil Procedure, CPLR § 308(2) does not require that a person served at the individual's dwelling place or usual place of abode be someone who actually resides there. *See New Y-Capp, Inc. v. Arch Capital Funding, LLC*, No. 18-CV-3223 (ALC), 2019 WL 4805897, at *5 (S.D.N.Y. Sept. 29, 2019).

As a general rule, the "actual dwelling place" or "usual place of abode" of a tenant in an apartment building is restricted to the tenant's actual apartment, as opposed to the lobby or common areas. *See Bruccoleri*, 2019 WL 499769, at *4. However, if "access to the person's actual apartment is limited, … service upon a doorman in the lobby constitutes service at the person's residence under CPLR § 308(2)." *Id.* (citing *F. I. duPont, Glore Forgan & Co. v. Chen*, 41 N.Y.2d 794, 797 (N.Y. 1977) ("[I]f a process server is not permitted to proceed to the actual apartment by the doorman or some other employee, the outer bounds of the actual dwelling place must be deemed to extend to the location at which the process server's progress is arrested")).

Here, the Affidavit of Service does not indicate whether the process server was allowed to proceed past the lobby of Quiles' building to the threshold of his apartment. Therefore, it is unclear whether delivery of the summons and complaint to Quiles' concierge constituted valid service under CPLR § 308(2) and, hence, Rule 4(e)(1).

Under New York law, a traverse hearing is required where, as here, genuine issues of fact exist as to whether service was properly made. *See Bruccoleri*, 2019 WL 499769, at *4; *CSC Holdings, Inc. v. Fung*, 349 F.Supp.2d 613, 618 (E.D.N.Y. 2004). Accordingly, the Court will set the matter down for a hearing unless one of the following occurs within **thirty (30) days** of the date of this order: (1) Plaintiff files an updated Affidavit of Service establishing that the concierge of Quiles' building was the location at which "the process server's progress [was] arrested" when service was attempted on October 12, 2018, *F. I. duPont*, 41 N.Y.2d at 797, or (2) Plaintiff re-effectuates service of process on Quiles in accordance with Rule 4 and files proof of such service with the Court.[11]

## CONCLUSION

For the foregoing reasons:

1.      Defendants' motion to compel arbitration and stay or, alternatively, dismiss the proceedings is **DENIED**; and

2.      Quiles' *pro se* correspondence is construed as a motion to dismiss pursuant to Rule 12(b)(5), and the motion shall be set down for a hearing unless, within **thirty (30) days** of the date of this order: (1) Plaintiff files an updated Affidavit of Service establishing that the concierge of Quiles' building was the location at which the process server's progress was

---

[11] Under Rule 4(m), the Court has discretion to extend the time for service of process to be effected. *See Ebanks v. Ebanks*, No. 07-CV-314 (KMK), 2007 WL 2591196, at *1 (S.D.N.Y. Sept. 6, 2007).

arrested when service was attempted on October 12, 2018, or (2) Plaintiff re-effectuates service of process on Quiles in accordance with Rule 4 and files proof of such service with the Court.

SO ORDERED.

Dated:      Brooklyn, New York
            October 18, 2019

/s_____
I. Leo Glasser           U.S.D.J.